Filed 9/28/23; certiified for publication 10/24/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE IRVINE COMPANY LLC,<br><br>　　Petitioner,<br><br>　　　v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>　　Respondent;<br><br>CHRISTINA DEMIRELLI,<br><br>　　Real Party in Interest. | G061791<br><br>(Super. Ct. No. 30-2020-01137834)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Donald F. Gaffney, Judge. Petition granted.

Schumann Rosenberg & Arevalo, Kim Schumann, Jeffrey P. Cunningham, and Marlys K. Braun for Petitioner.

No appearance for Respondent.

Dordick Law Corporation, Gary A. Dordick and John M. Upton for Real Party in Interest Christina Demirelli.

After having consumed excessive amounts of alcohol, Christina Demirelli left a restaurant in the Fashion Island shopping center (Fashion Island) and walked through a nearby parking structure while engaging in "displays of nonsensical horseplay." She found herself on an upper story of the parking structure where she seated herself on a 43-inch tall perimeter wall, lost her balance, and fell backward out of the structure to the ground several stories below. Demirelli sustained serious injuries.

Demirelli sued The Irvine Company, which owned the parking structure, for premises liability, alleging the parking structure had a physical defect or dangerous condition. The Irvine Company filed a motion for summary judgment which the trial court denied. The Irvine Company filed a petition for writ of mandate, and we issued an order to show cause. We now grant The Irvine Company's petition.

In her opposition, Demirelli conceded the parking structure did not have a physical defect or dangerous condition. In the stead of her original theory, Demirelli asserted a new theory of liability—The Irvine Company had *assumed* a duty to her by hiring a security company charged with detecting and stopping horseplay according to the Fashion Island Code of Conduct. She argued The Irvine Company was liable for the security company's negligence in enforcing that code.

According to the California Supreme Court's decision in *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 248–249 (*Delgado*), such a theory of liability is not one of premises liability, but of negligent undertaking. The *Delgado* court explained "a defendant's undertaking will support the finding of a duty to another only if (a) the defendant's action increased the risk to another, or (b) the other person reasonably relied upon the undertaking to his or her detriment." (*Id.* at p. 250.)

Here, The Irvine Company's retention of security services did not increase any risk to Demirelli and she did not rely on that undertaking to her detriment. Therefore, The Irvine Company did not owe a duty to Demirelli and summary judgment should have been granted.

2

## SUMMARY OF UNDISPUTED FACTS AND DEMIRELLI'S ADDITIONAL MATERIAL FACTS

### I.

### THE INCIDENT

On Sunday, July 14, 2019, Demirelli and her friend and roommate Emily Yoder, both in their mid-twenties, went to the Xanadu Café in Newport Beach for brunch and "'bottomless mimosas.'" Beginning around 3:00 p.m., Demirelli consumed four to five alcohol beverages (mimosas) at Xanadu Café.

Demirelli and Yoder decided to "walk off" their intoxication by shopping at Fashion Island. They ended up at the Yard House restaurant in Fashion Island (Yard House) where, starting around 7:00 p.m., Demirelli consumed four gin martinis and smoked marijuana to the point that she was in a "'state of significant intoxication'" and a danger to herself. Yoder drank two stout beers and one vodka martini. The only food they had on their bar tab at Yard House that evening was a single order of Edamame soybeans. The bartender thought Demirelli appeared drunk and Yoder appeared "'buzzed'" while she served them that evening.

About 30 minutes after arriving at Yard House, Demirelli and Yoder engaged in "'disruptive acts.'" The bartender observed Demirelli and Yoder acting in an obnoxious manner; Yoder was crying loudly and Demirelli was yelling at her and giving her advice. Demirelli and Yoder were eventually asked to leave the restaurant.

At approximately 10:10 p.m., Yard House employee Justin Harris (a named defendant in Demirelli's lawsuit) encountered Demirelli and Yoder leaving the restaurant. Harris walked with them towards and then into the lowest level of the parking structure adjacent to the restaurant and then up to one of the higher levels. As the group walked to and through the parking structure, Demirelli "began rolling around on the floor of the structure, doing cartwheels, and [engaging in] similar displays of nonsensical horseplay." Demirelli "'exhibited behaviors indicative of extreme intoxication.'" She

3

had irrational and unintelligible speech, was unsteady in her walking, would sit and squat down at random times, had difficulty putting on her shoes, and had difficulty maintaining her equilibrium. After Demirelli went up a flight of stairs and Yoder followed, Harris left them and the structure.

About 15 minutes after Harris had left, Demirelli was seated on a "perimeter wall on what was likely an upper story of the parking garage with her legs to the inside of the structure and her back toward the outside." Yoder saw Demirelli sitting on the perimeter wall for several minutes and warned Demirelli, saying something to the effect of "'Don't do that'" and "'Be careful.'" Around 11:00 p.m., Demirelli lost her balance and fell backward out of the parking structure and to the ground several stories below. Demirelli sustained serious injuries, including a traumatic spinal cord injury. Demirelli's blood alcohol level was determined to be 0.30% from an 11:30 p.m. blood draw.

Demirelli and Yoder did not have any reason to be in the parking structure that evening, as neither had driven a vehicle to Fashion Island. Demirelli does not have any independent memory of the incident. She does not know how she got onto a perimeter wall of the parking structure or why she fell from the perimeter wall. Both Demirelli and Yoder believe that sitting on an elevated perimeter wall of a parking structure is dangerous.

II.

THE PARKING STRUCTURE'S CONDITION

The 43-inch vertical height of the perimeter wall panels of the parking structure east of "Stairway [No.] 5" on the second through fourth levels met and exceeded the 42-inch minimum vertical height requirement of the applicable building code and complied with the building plan specifications for such wall panels. The lighting conditions in the parking structure located east of stairway No. 5, on the second

4

through fourth levels, met and exceeded the applicable lighting requirements of the City of Newport Beach Municipal Code.

The perimeter wall panel of the parking structure from which Demirelli fell (whether on its second, third, or fourth level) did not present any dangerous condition and was safe for pedestrians using reasonable care. Neither that perimeter wall panel, nor its surrounding area, presented any characteristic which would have invited a pedestrian to climb or sit atop the wall panel.[1]

Prior to the incident, The Irvine Company regularly inspected the parking structure and did not observe any problems or safety issues regarding the perimeter wall of the parking structure. "No department, agency, or other body of the government of the County of Orange or City of Newport Beach has issued any notice of violation or any other type of notice regarding the perimeter wall of [the] Parking Structure." Up until Demirelli filed the complaint, no entity or person had complained, otherwise stated, or provided notice to The Irvine Company that the perimeter wall of the parking structure presented any type of hazard or danger.

None of the other defendants in this action, including Yard House or Harris, has ever been the agent, servant, or employee of or a joint venturer with The Irvine Company.

III.

SECURITY SERVICES AT FASHION ISLAND

The Irvine Company owns Fashion Island, including the subject parking structure. The Irvine Company contracted with Universal Protection Service, doing business as Allied Universal Security Services (Allied), to provide security services at

---

[1] In her responsive separate statement, Demirelli stated this fact is disputed because "[s]omething about it enticed [her] onto it." But Demirelli also testified at her deposition she had no memory of the incident and that her last memory was sitting at the bar top at Yard House.

5

Fashion Island. Pursuant to The Irvine Company's contract with Allied, the scope of security services to be provided included: (1) identifying and reporting security and safety issues, including fire hazards, leaking water pipes, and unlocked security doors; (2) ensuring prompt action is taken to prevent or minimize losses, accidents, fire, property damage, safety hazards, and security incidents; (3) warning violators of rule infractions such as loitering, smoking, or possession of contraband articles; (4) monitoring throughout security personnel shifts "all Common area corridors, sidewalks, roads, alleys, food courts, and people spaces for trash, debris, shopping carts, spills, hazards or property damage"; and (5) assisting The Irvine Company "by resolving any issue (example: picking up trash, cleaning up spills, shopping cart return) or report[ing] any liability issues (example: trip and fall hazards, utility failure, etc.) to [The Irvine Company] immediately." The contract also provided that Allied would train replacement security professionals on property procedures before "standing post."

The Irvine Company and Allied jointly developed a Security Operations Procedure Manual pertaining to Fashion Island, within which is the Fashion Island Code of Conduct. Fashion Island's security team and Allied were responsible for enforcing the code of conduct in effect on the date of the incident. The Security Operations Procedure Manual provides, inter alia: (1) security staff will focus on maintaining a visible security presence in all areas of the property and are responsible for providing customer service, detecting and responding to potential and actual safety concerns, and otherwise helping "prevent and/or reduce liability situations"; (2) security employees must continuously and proactively patrol their assigned areas, unless assigned to a fixed post position; and (3) Allied "should ensure that officers using the system are fully trained on how to operate the system as it was designed, including CCTV [(closed circuit television)], alarm monitoring, access control and call stations."

The Fashion Island Code of Conduct prohibits Fashion Island visitors from "[r]unning, shouting, skateboarding, skating, rollerblading, riding a bicycle, scooter or

6

Segway, horseplay, throwing of any objects, disorderly or disruptive conduct of any type or engaging in activities which unreasonably obstruct or interfere with the free flow of vehicular or pedestrian traffic."

IV.

DEMIRELLI'S SECURITY EXPERT

Demirelli's security expert Michael Glasser opined Allied personnel failed to follow portions of the Security Operations Procedure Manual requiring Allied to provide adequate supervision and training of their security personnel assigned to the CCTV console at Fashion Island. He explained Allied was contractually required to detect and report security and safety issues, but failed to detect and put a stop to Demirelli's horseplay in the parking structure and otherwise warn Demirelli and Yoder that they were in violation of the code of conduct.

The security professional assigned to the CCTV console post on the evening of July 14, 2019 was a new hire whose training at that time was incomplete. The more experienced security professional who accompanied the new security professional in training had been in the break room at the time Demirelli was engaged in horseplay activities. The new security professional, who was unsupervised at the time, did not detect Demirelli's behavior was problematic and Allied did not dispatch officers to Demirelli's location in the parking structure "to resolve the issue before it escalated."

7

PROCEDURAL HISTORY

I.

THE FIRST AMENDED COMPLAINT

In March 2020, Demirelli filed her lawsuit and, a few months later, filed and served her first amended complaint for damages. In her first amended complaint, Demirelli asserts a single claim against The Irvine Company for premises liability.

In support of the premises liability claim, the first amended complaint alleged The Irvine Company "negligently and carelessly owned, operated, secured, built, constructed, developed, designed, maintained, inspected, repaired, [and] managed the Premises." The first amended complaint alleged The Irvine Company was negligent by "failing to provide adequate and safe perimeter walls of the structure" and by "failing to take reasonable steps to eliminate the risks and dangers" they posed. The first amended complaint further alleged: "As a direct and proximate result of said dangerous and unsafe conditions of the premises, Plaintiff was caused to sustain injuries and damages as set forth herein."

The first amended complaint also contained claims for negligent undertaking and for negligent hiring, supervision, training, and/or retention against Yard House and other named defendants who are not parties to these writ proceedings.

II.

THE MOTION FOR SUMMARY JUDGMENT AND DEMIRELLI'S OPPOSITION

In August 2021, The Irvine Company filed a motion for summary judgment in which it argued: (1) the perimeter wall of the parking structure did not present any dangerous condition; (2) Demirelli's "extreme misuse of the perimeter wall of parking structure no. 2 at the Fashion Island Shopping Center was not reasonably foreseeable, and Irvine Company as a matter of law thus did not owe a duty to take the measures alleged by [Demirelli]"; and (3) "Irvine Company did not have actual or constructive notice of the claimed 'dangerous condition,' including where prior to the subject incident, no

8

person had fallen from the perimeter wall or any parking structure, including parking structure no. 2, of the Fashion Island Shopping Center." (Boldface and some capitalization omitted.)

Demirelli filed an opposition to the motion. In support of her opposition Demirelli submitted, inter alia, Glasser's declaration; excerpts from her own deposition, Yoder's deposition, and from those of several other percipient witnesses; and excerpts from the parties' discovery responses.

Demirelli did not request a continuance of the hearing on the motion for summary judgment or otherwise argue she had not completed any discovery that might be relevant to defend against it.

III.

### THE TRIAL COURT DENIES THE MOTION FOR SUMMARY JUDGMENT

The trial court denied The Irvine Company's motion, finding the evidence provided by Demirelli's expert witness on security services "raised numerous triable issue[s] of material fact[]." In its minute order, the trial court explained:

"'[Allied] failed to provide adequate training of the "Security Professional" that was assigned to Fashion Island CCTV Console. Failure to provide appropriate training failed to meet the standard of care for providing security services of this type.['] . . . 'Pursuant to the Division Services Contract between the Irvine Company and [Allied], [Allied] was required to warn violators of rule infractions. [Allied] failed to warn Christina Demirelli and Emily Yoder that they were in violation of the Fashion Island Code of Conduct, based on their conduct in [the parking structure].' . . . 'Based on the Daily Activity Log of Mr. Gonzalez, it appears Mr. Gonzalez was in the Break Room and not at the CCTV Console at 22:25.' . . .

"'[Allied] failed to recognize the activities of Christina Demirelli as suspicious or unusual, which is one of the responsibilities of the Security Professional who is monitoring the CCTV consoles.' . . . '[Allied] failed to dispatch officers to the

9

locations of Christina Demirelli's activities in parking structure #2 to resolve the issue before it escalated, pursuant to the Security Operations Procedure Manual, which states that, officers working at the console were not only responsible for monitoring the cameras and other systems, but more importantly for directing the center's security patrol.' . . .

"'In Mr. Glasser's opinion, The Security Professionals fell far short of their responsibilities with respect to proactively looking for anyone who needed any sort of assistance and code of conduct violations including identifying Christina Demirelli's activities in [the parking structure] prior to the incident.' . . . 'Mr. Glasser opines that based on the breaches of the standard of care by the Irvine Company and [Allied], Christina Demirelli fell from [the parking structure] and was severely injured on the date of the subject incident.' . . .

"Thus, [Demirelli] has raised a number of triable issues of material fact."[2]

---

[2]  In its minute order, preceding its discussion under the heading "Triable Issues of Material Facts" (boldface omitted), the trial court stated The Irvine Company "potentially has a duty of due care, because of the special relationship with Plaintiff." The idea of a special relationship appears to have been first raised by the trial court at this stage of the litigation; Demirelli had not pleaded a special relationship and no party raised the issue of the existence of a special relationship in any of the papers submitted in connection with the motion for summary judgment.

The trial court cited *Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 893, which states: "'As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some [special] relationship between them which gives rise to a duty to act.' [Citation.] 'Typically, in special relationships, "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare. [Citation.]" [Citation.] A defendant who is found to have a "special relationship" with another may owe an affirmative duty to protect the other person from foreseeable harm, or to come to the aid of another in the face of ongoing harm or medical emergency.'"

No party has cited any relevant legal authority, and we have found none, supporting the proposition that a special relationship existed between Demirelli and The Irvine Company to protect against the harm Demirelli suffered in this case. There are no

10

IV.

THE PETITION FOR WRIT OF MANDATE

The Irvine Company challenged the trial court's order by filing a petition for writ of mandate in this court, requesting issuance of a writ of mandate directing the respondent court to vacate its order denying the motion for summary judgment and enter an order granting the motion for summary judgment. In the petition, The Irvine Company argues, inter alia, as a matter of law, it owed no duty to provide security at the parking structure to prevent Demirelli from harming herself. Demirelli filed preliminary opposition to the petition and The Irvine Company filed a reply brief.

This court issued an order to show cause why mandate or other appropriate relief should not issue. We ordered Demirelli to file a formal return to the petition, invited any other real party in interest to file a formal return to the petition, and ordered The Irvine Company to file a formal reply thereafter.

Demirelli filed a formal return and The Irvine Company filed a formal reply accordingly.

DISCUSSION

I.

GOVERNING LEGAL STANDARDS AND STANDARD OF REVIEW

"An order denying a motion for summary judgment may be reviewed by way of a petition for writ of mandamus. [Citations.] '"Where the facts are undisputed and the law establishes the right of a party to an order or to the relief which the court has refused, the writ will lie."' [Citation.] A writ of mandamus will issue when the denial of

---

allegations or evidence showing Demirelli was dependent upon The Irvine Company or that The Irvine Company had any control over her welfare. To the contrary, Demirelli's current theory of liability is The Irvine Company (vis-à-vis Allied) *failed* to assert control over Demirelli and stop her horseplay. Furthermore, there is no contention The Irvine Company failed to come to Demirelli's aid following the incident.

11

a motion for summary judgment results in a trial on a nonactionable claim." (*LeFiell Manufacturing Co. v. Superior Court* (2014) 228 Cal.App.4th 883, 891, citing Code of Civ. Proc. § 437c, subd. (m)(1); see *General Atomics v. Superior Court* (2021) 64 Cal.App.5th 987, 1001–1002 [same].)

"'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. [Citation.] [¶] Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' [Citation.] A defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action. [Citation.] . . . '*Duty, being a question of law, is particularly amenable to resolution by summary judgment.*'" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618, italics added.)

II.

DEMIRELLI HAS ABANDONED ANY THEORY OF PREMISES LIABILITY BASED ON A PHYSICAL DEFECT OR DANGEROUS CONDITION

Demirelli asserted a single claim against The Irvine Company for premises liability expressly based on allegations the parking structure and/or its features were *physically* defective and/or had a dangerous condition. In her opposition to the motion for summary judgment, Demirelli abandoned these allegations of physical defect or dangerous condition as the basis for her claim against The Irvine Company, stating she "is *not* disputing the aspects of [The Irvine Company]'s Motion that the physical configuration of Parking Structure No. 2 in general, or the perimeter wall specifically, *did*

12

*not* present a dangerous condition." (Italics added.) She also did not challenge the evidence presented by The Irvine Company showing the parking structure, including the perimeter wall, were up to code and without physical defect or a dangerous condition. In her responsive separate statement, Demirelli agreed the following fact identified in The Irvine Company's moving papers was undisputed: "The perimeter wall panel of Parking Structure No. 2 from which Plaintiff fell in the Subject Incident (whether on its second ('P2'), third ('P3') or fourth ('P4') level) did not present any dangerous condition and was safe for pedestrians using reasonable care."

In addition, Demirelli acknowledged the following facts proposed by The Irvine Company in support of its motion were "[u]ndisputed": (1) "The 43-inch vertical height of the perimeter wall panels of Parking Structure No. 2 located east of Stairway #5, on its [second through fourth] levels, met and exceeded the 42-inch minimum vertical height requirement of the applicable Building Code" and the panels "were constructed in compliance with the building plan[] specifications for such wall panels"; (2) "The lighting conditions in Parking Structure No. 2 located east of Stairway #5, on its [second through fourth] levels, met and exceeded the applicable lighting requirements of the City of Newport Beach Municipal Code"; (3) "Prior to the [s]ubject incident, The Irvine Company regularly inspected the parking structure and did not observe any problems or safety issues regarding the perimeter wall of the parking structure"; (4) "No department, agency or other body of the government of the County of Orange or City of Newport Beach has issued any notice of violation or any other type of notice regarding the perimeter wall of Parking Structure No. 2"; and (5) until Demirelli filed the complaint, "no entity or person had complained, otherwise stated or provided notice to [The] Irvine Company that the perimeter wall of Parking Structure No. 2 presented any type of hazard or danger."

Based on Demirelli's concessions, summary judgment should have been granted to the extent her premises liability claim was based on a theory The Irvine

13

Company breached any duty to her as a result of a physical defect or dangerous condition as to the perimeter wall or the parking structure in general.

III.

### DEMIRELLI'S REMAINING THEORY OF LIABILITY IS NOT ONE OF PREMISES LIABILITY BUT OF NEGLIGENT UNDERTAKING PURSUANT TO *DELGADO, SUPRA*, 36 CAL.4TH 224

Having abandoned any theory of liability based on a physical defect or dangerous condition, Demirelli argued in her opposition to the motion for summary judgment The Irvine Company's liability is based on the negligent failure of its security company Allied to detect and then stop Demirelli's own horseplay, pursuant to the code of conduct Allied was retained by The Irvine Company to enforce. On such a theory of liability, Demirelli argued, her premises liability claim should survive summary judgment.

Demirelli did not include factual allegations supportive of her then current theory of liability in the first amended complaint.[3] There are no references to Allied or the provision of security services generally in the first amended complaint.

---

[3] In her formal return, Demirelli cited to the following portions of the first amended complaint in support of her argument "[t]he negligent performance of Petitioner's security was always a part of RPI Demirelli's claim":

(1) in paragraph 34: the common areas of Fashion Island, including the parking structure "were owned operated, promoted, *patrolled*, *secured*, built, constructed developed, designed, maintained, inspected, repaired, *managed*[,] serviced or otherwise controlled by Defendants, and each of them";

(2) in paragraph 35: "Defendants, and each of them, . . . negligently and carelessly owned, *operated*, *secured*, built, constructed, developed, designed, maintained, inspected, repaired, [and/or] managed the Premises"; and

(3) in paragraph 40: "The premises were in a dangerous and unsafe condition due to the negligent discharge of mandatory and nondelegable duties, ownership, leasing, *control*, *securing*, operation, building, construction, engineering, development, design, maintenance, management, inspection, and/or repair of the premises, including the construction of short perimeter walls, flat on top and inviting persons to sit down, as well as lacking any sort of guardrails, barriers, fencing, or other fall prevention devices by said Defendants, and each of them." (Italics added.)

14

In evaluating whether a triable issue of fact exists regarding Demirelli's premises liability claim, it is significant Demirelli is clear she does *not* contend The Irvine Company had an affirmative duty to provide security services in the parking structure in the first place. Demirelli's position is consistent with cases holding a landowner does not have a duty to provide elevated security measures to protect against the unforeseeable criminal acts of third parties, much less against the self-endangering acts of a patron caused by the patron's voluntary intoxication. For example, in *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, disapproved of on other grounds in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, footnote 5, the California Supreme Court held a shopping center's owner's duty to maintain common areas within its possession and control in a reasonably safe condition did not include a duty to provide security guards to protect against the criminal act of a third party under the facts of that case.

In *Montes v. Young Men's Christian Assn. of Glendale, California* (2022) 81 Cal.App.5th 1134, 1142, the appellate court concluded the defendant landowner in a wrongful death action based on premises liability and negligence owed no duty of care to a resident who had been drinking and had acted erratically before falling from the steep roof of the apartment building. The court explained: "[T]here are no other circumstances in this case that might explain why it was reasonably foreseeable Mr. Montes might choose to venture onto a steep sloping roof that was obviously dangerous. [Citation.] Plaintiffs 'cannot use [Mr. Montes's] voluntarily induced state of intoxication to claim that he was unaware of the obvious peril . . . .'" (See *id.* at p. 1142 ["The law, as we have just described it, is that defendant owed no duty to do anything to protect Mr. Montes from his voluntary, unnecessary, and uninvited risk taking"].)

In *Edwards v. California Sports, Inc.* (1988) 206 Cal.App.3d 1284, 1288–1289, the appellate court explained: "'''The applicable general principle is that the owner of the property, insofar as an invitee is concerned, is not an insurer of safety but

15

must use reasonable care to keep his premises in a reasonably safe condition and give warning of latent or concealed peril. He is not liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care.'" [Citations.]' [Citation.] [¶] Further, plaintiff cannot use his own voluntarily induced state of intoxication to claim that he was unaware of the obvious peril of climbing a fence designed to prevent a fall from a height of 15 feet to a concrete surface."

Instead of arguing The Irvine Company owed her an affirmative duty to provide security to protect her from the harm she suffered, Demirelli argues that, upon retaining Allied to enforce the Fashion Island Code of Conduct, The Irvine Company *assumed* a duty that Allied would perform its contractual responsibilities. In her formal return, Demirelli states at pages 8, 13–14, and 34: "Contrary to the tenor of the Petition, the issue in this case involves the scope of *an assumed duty to protect once a landowner has employed a guard service. The issue is not whether Irvine had a duty to employ*[] *guards*, but rather the scope of that duty which can only be determined from a factual examination of the services actually provided by the guards within and beyond the scope of any written contract." (Italics added.)

Pursuant to the Supreme Court's decision in *Delgado, supra*, 36 Cal.4th at pages 248–249, Demirelli's current theory of liability is not one of "premises liability" but of the "related but separate doctrine" of negligent undertaking. In *Delgado*, the Supreme Court made this distinction in its review of the conflict that had arisen between the appellate court's decision in the case before it and the appellate court's decision in *Mata v. Mata* (2003) 105 Cal.App.4th 1121 (*Mata*).

In *Mata*, a disgruntled customer who had been removed from a bar later returned and fired shots into the bar, killing one and injuring several others. (*Id.* at pp. 1126–1127.) The bar proprietor was sued on a premises liability theory based on the alleged negligence of its hired security during the incident. (*Id.* at pp. 1124, 1126, 1129.)

16

The appellate court in *Mata, supra*, 105 Cal.App.4th 1121 reversed an order granting summary judgment, holding that when a bar proprietor voluntarily employs a guard on its premises, the proprietor has "assumed" a "duty to protect" its patrons from criminal assault "and therefore the issue of foreseeability becomes irrelevant." (*Id.* at p. 1128.)

The Supreme Court in *Delgado* court stated, "[W]e believe it is appropriate at this time to address the *Mata* decision and to explain why we, like the Court of Appeal, find some of the language and analysis of *Mata* to be overbroad and potentially misleading." (*Delgado, supra*, 36 Cal.4th at p. 247.) It explained the *Mata* court's determination a duty existed "may have been influenced by the appellate court's understanding of a related but separate doctrine—the negligent undertaking doctrine." The *Delgado* court elaborated:

"Our cases establish that a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result. Even if the court in *Mata* may have been influenced by that doctrine, however, the decision's broad language failed to recognize the important limitations and qualifications of that doctrine.

"*Mata* indicated in expansive terms that by hiring a guard a proprietor necessarily assumes a general duty to protect its patrons. We disagree. First, the scope of any duty assumed depends upon the nature of the undertaking. [Citation.] Merely because a supermarket or other similar enterprise 'chooses to have a security program' that includes provision of a roving security guard does not signify that the proprietor has assumed a duty to protect invitees from third party violence. [Citation.] A store that hires a 'security officer' to guard its interior 'cash office' for three hours each day does not assume a duty to protect a customer who is injured in the store's exterior parking lot

17

by the criminal act of a third party. [Citation.] Second, as noted, *ante*, a defendant's undertaking will support the finding of a duty to another only if (a) the defendant's action increased the risk of harm to another, or (b) the other person reasonably relied upon the undertaking to his or her detriment. [Citation.] The court in *Mata* did not consider whether the imposition of liability in that case was consistent with these limitations.

"Finally, contrary to the implications of *Mata's* broad language [citation], foreseeability remains a highly relevant factor—even in cases in which a legal duty is found (and regardless of the doctrine under which it is found). For example, even when a proprietor voluntarily has employed one or more guards and properly is found to owe a duty to patrons, foreseeability remains relevant to the fact finder's determination of breach and causation." (*Delgado, supra*, 36 Cal.4th at pp. 248–250, fn. omitted.)

As discussed *ante*, Demirelli does not take and has not taken the position The Irvine Company owed a general duty to retain security for the parking structure, but that it assumed a duty to provide security upon hiring Allied to enforce the Fashion Island Code of Conduct. As such, in light of *Delgado, supra*, 36 Cal.4th 224, Demirelli's theory of liability against The Irvine Company is one of negligent undertaking and not premises liability.

In her formal return, Demirelli tacitly acknowledges her theory of liability against The Irvine Company is for a negligent undertaking, ultimately noting: "The Petition should be denied because 'there may be fact questions "about precisely what it was the defendant *undertook* to do." That is, while "[t]he 'precise nature and extent' of [an alleged *negligent undertaking*] duty 'is a question of law . . . "it depends on the nature and extent of the act undertaken, a question of fact."'"'" (Bracketed material in original, italics added.)

Consequently, no triable issue of fact exists as to the pleaded theory of premises liability against The Irvine Company.

18

## IV.

### DEMIRELLI FAILED TO PLEAD A NEGLIGENT UNDERTAKING AGAINST THE IRVINE COMPANY IN THE FIRST AMENDED COMPLAINT

"The pleadings play a key role in a summary judgment motion and ""'set the boundaries of the issues to be resolved at summary judgment.'"" [Citation.] '[T]he scope of the issues to be properly addressed in [a] summary judgment motion' is generally 'limited to the claims framed by the pleadings. [Citation.] A moving party seeking summary judgment or adjudication is not required to go beyond the allegations of the pleading, with respect to new theories that could have been pled, but for which no motion to amend or supplement the pleading was brought, prior to the hearing on the dispositive motion.'" (*Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 444 (*Jacobs*).)

Here, although Demirelli pleaded a claim for negligent undertaking against other defendants in the first amended complaint, she neither pleaded such a claim against The Irvine Company nor included allegations suggesting her theory of liability, however titled, was based on a breach of an assumed duty to provide security services to enforce the Fashion Island Code of Conduct.[4] A fair reading of the first amended complaint's allegations does not suggest a negligence claim against The Irvine Company based on anything other than the physical condition of the parking structure and perimeter wall. As "[t]here [was] no mention, suggestion, or any facts alleged that would put a reasonable defendant on notice" Demirelli was claiming The Irvine Company was

---

[4]  In its minute order, the trial court stated Demirelli had alleged The Irvine Company negligently patrolled, secured and/or otherwise controlled the Premises by failing to take reasonable steps to eliminate the risks and dangers "'to guests making use of the Premises by . . . failing to hire competent employees, agents, and/or contractors to secure the safety of patrons and invitees; failing to provide adequate security; failing to keep the Premises safe for patrons, invitees and residents; . . . and/or make sure the Premises had adequate and sufficient safety measures to guard against accidental fails.'" However, the above quoted material does not appear in the first amended complaint.

19

negligent with respect to the code of conduct, The Irvine Company's motion for summary judgment did not need to address that claim. (*Jacobs, supra*, 14 Cal.App.5th at p. 444.)

Furthermore, our record does not show Demirelli sought to amend the first amended complaint to include allegations relevant to her current theory of liability against The Irvine Company. (See *Jacobs, supra*, 14 Cal.App.5th at p. 445 ["Plaintiffs could have sought to amend their complaint, and their failure to do so precluded them from defeating [the defendant's] motion for summary judgment based on their new theory"].)

V.

EVEN IF DEMIRELLI'S NEGLIGENT UNDERTAKING CLAIM AGAINST THE IRVINE COMPANY HAD BEEN PROPERLY PLEADED, NO TRIABLE ISSUE OF FACT EXISTS AS TO THAT CLAIM

Even assuming Demirelli had properly pleaded a negligent undertaking claim against The Irvine Company, no triable issue of fact exists as to that claim either. (*Hanouchian v. Steele* (2020) 51 Cal.App.5th 99, 114 (*Hanouchian*) ["'Whether the defendant's undertaking, if proven, gave rise to a duty of care is a question of law for the court to decide'"].)

As discussed *ante*, the Supreme Court in *Delgado, supra*, 36 Cal.4th at pages 249–250 explained: "First, the scope of any duty assumed depends upon the nature of the undertaking. . . .  Second . . . a defendant's undertaking will support the finding of a duty to another *only if* (a) the defendant's action *increased* the risk of harm to another, or (b) the other person reasonably relied upon the undertaking to his or her detriment." (Italics added; see *Golick v. State of California* (2022) 82 Cal.App.5th 1127, 1148 ["Failing to eliminate a preexisting risk of harm does not satisfy the element of increased risk required to establish a negligent undertaking"].)

Here, even if we presume The Irvine Company assumed a duty to protect Demirelli from harming herself by hiring Allied to detect and stop horseplay in the parking structure, *nothing* in the record creates a triable issue of material fact such an

20

undertaking increased the risk of harm to Demirelli or that Demirelli reasonably relied on The Irvine Company's undertaking to her detriment.  If anything, by retaining Allied, The Irvine Company *decreased* the risk of harm by increasing the chance security officers might detect and stop Demirelli before she injured herself; it did not create any new peril by doing so.  Furthermore, no evidence shows Demirelli relied on the presence of security to stop her from engaging in horseplay and from ultimately sitting on the perimeter wall.  To the contrary, Demirelli testified she remembers nothing about the incident, or ever being inside the parking structure—a parking structure she had no reason to enter in the first place.

The appellate courts' decisions in *University of Southern California v. Superior Court* (2018) 30 Cal.App.5th 429, 436–437, disapproved on other grounds in *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 221, footnote 9 (*Southern California*) and *Hanouchian, supra*, 51 Cal.App.5th 99 are consistent with our conclusion.

In *Southern California*, a party attendee sued a university after she was pushed from a makeshift platform and injured at an off-campus fraternity party where alcohol was served.  (*Southern California, supra*, 30 Cal.App.5th at pp. 436–437.)  The plaintiff maintained the university, "by adopting policies regarding alcohol use and social events and providing a security patrol both on and off campus," had assumed a duty to protect party attendees from third party conduct at fraternity parties.  (*Id.* at p. 449.)  The *Southern California* court disagreed.  First, the court concluded the university's undertaking did not increase the risk of harm:  "By establishing policies governing fraternities, providing a security patrol with authority to enforce those policies both on and off campus, and failing to enforce those policies by shutting down the [fraternity] party after it began or preventing the party from occurring in the first place, [the university] did not create any new peril."  (*Id*. at p. 450.)

Second, the *Southern California* court determined the plaintiff could not show she "actually or reasonably relied" upon the alleged safety policies:  "Despite her

21

deposition testimony that she relied on [the university's public safety department] to protect her, there is no indication that her awareness of the existence of [the public safety department] caused her to behave any differently. [Citation.] The evidence also does not support her claim that any reliance was reasonable. [The plaintiff] acknowledged that the party was 'very large, very crazy, packed and crowded,' and there was no visible security or control. Alcohol was plentiful. . . . [The plaintiff] stepped onto a makeshift raised platform to dance with her friends amid other partygoers and was bumped off the platform and fell to the ground. In these circumstances, any reliance on [the university] or [its public safety department] to protect her from harm was unreasonable." (*Southern California, supra*, 30 Cal.App.5th at pp. 450–451, fn. omitted.)

In *Hanouchian, supra*, 51 Cal.App.5th 99, the plaintiff sued members of a sorority after he was assaulted by two intoxicated partygoers at the defendants' off-campus residence. (*Id.* at pp. 103, 105.) The appellate court affirmed the trial court's order which sustained the defendants' demurrers "and entered a judgment of dismissal, concluding [defendants] did not owe Plaintiff a legal duty to follow the [university's] protocols." (*Id.* at p. 103.) The appellate court held: "Just as the university in *Southern California* did not increase the risk of harm by failing to enforce policies that required it to shut down the fraternity party, so too [defendants] did not increase the risk of harm to Plaintiff by throwing an open party in violation of the safety protocols their sorority had agreed to with [the university]. (See *Southern California, supra*, 30 Cal.App.5th at p. 450; see also *City of Santee v. County of San Diego* (1989) 211 Cal.App.3d 1006, 1015–1016 [The 'increased risk' element of the negligent undertaking doctrine is not satisfied where the defendant merely 'fail[ed] to eliminate a preexisting risk.'].)" (*Hanouchian, supra*, 51 Cal.App.5th at p. 115.)

The *Hanouchian* court's analysis continued: "Nor can Plaintiff prove he actually and reasonably relied upon [the university]'s safety protocols. The operative complaint alleges, on information and belief, that the protocols required, among other

things, security, a guest list, and limits on alcohol.  But Plaintiff admits that, upon entering the party, he 'observed' there was no guest list or anyone checking identification (in fact, he was an uninvited attendee); there was 'no security present'; and 'many people at the party were openly taking or consuming illegal drugs.'  Even if Plaintiff could allege he knew about the safety protocols at the time he attended the party (which he does not), he cannot possibly prove based on these facts that he reasonably relied upon the protocols to protect him." (*Hanouchian, supra*, 51 Cal.App.5th at p. 115.)

For the all the above reasons, no triable issue of material fact exists as to Demirelli's negligence claim against The Irvine Company.  The trial court therefore erred by denying the motion for summary judgment.


## DISPOSITION

The petition for writ of mandate is granted.  Let a writ of mandate issue directing the trial court to vacate its order denying The Irvine Company's motion for summary judgment.  Petitioner to recover costs in this proceeding.



MOTOIKE, J.

WE CONCUR:



BEDSWORTH, ACTING P. J.



MOORE, J.


23

Filed 10/24/23    **CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

THE IRVINE COMPANY LLC,

   Petitioner,

     v.

THE SUPERIOR COURT OF ORANGE
COUNTY,

   Respondent;

CHRISTINA DEMIRELLI,

   Real Party in Interest.

G061791

(Super. Ct. No. 30-2020-01137834)

ORDER GRANTING REQUEST
FOR PUBLICATION

Darden Restaurants, Inc., Yard House USA, Inc., Jerome Erickson, and Justin Harris, who are defendants in the underlying action, have filed a request that our opinion, filed September 28, 2023, be certified for publication. Petitioner The Irvine Company LLC has filed a notice of joinder in the request to publish. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c)(2) and (3). The request is GRANTED. The opinion is ordered published in the Official Reports.

MOTOIKE, J.

I CONCUR:

MOORE, ACTING P. J.